[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
On February 17, 1993, after 22 months in foster placement (which began when she was 22 months old), Victoria D., born 7/18/89, became the subject of this petition filed by the Department of Children and Families (hereinafter DCF) seeking to terminate the parental rights of Gary D. and Dyan W., her father and mother, so that she could achieve a permanent home through adoption. At the initial hearing on 3/18/93, personal service was confirmed on both parents, who were then and at all subsequent hearings on this petition, represented by separate court-appointed private attorneys. The mother failed to attend the hearing and all subsequent hearings on this petition despite the diligent efforts of her attorney with whom she maintained intermittent contact. Gary D., incarcerated since October of 1990, attended all hearings under writs of habeas corpus.
For reasons that do not appear of record, trial dates set for September of 1993 did not take place and the matter was continued until trial was concluded, after two hearing dates, on 5/6/94. Since none of the parties requested time for the filing of trial memoranda, decision was reserved on that date.
Facts
Evidence offered on April 13 and May 6 of 1994, interpreted in the light of the prior record in this court concerning this child, of which judicial notice is taken, CT Page 6881-A supports the findings of the following facts:
Dyan W., after graduating from high school, returned to live with her adoptive parents when she became pregnant with her first child, born in April of 1987. After marrying this child's father, she and the baby returned again to the home of her parents who subsequently obtained custody of that child in another court. After separating from her first husband, Dyan became pregnant with Victoria (hereinafter Vicky) and began living with Vicky's father, Gary D., in the spring of 1989. In June of 1990 Dyan and Gary were married. Four months later Gary was arrested and has remained incarcerated to the present time. Dyan obtained a divorce from Gary and married the third time before her 25th birthday. She and her third husband have two children and she has indicated to the DCF social workers that she now has a new life and does not want DCF to "bother" her again. (State's Exh. J., 2nd and 3rd unnumbered pages.)
Gary D., ten years Dyan's senior, was first arrested at 17 after dropping out of school in the tenth grade. He served his first sentence before he was 20 and, in 1983, at the age of 25, was arrested for 109 charges of burglary and larceny and sentenced to 12 years, suspended after eight. He had earlier married and fathered a daughter in 1979. His first wife divorced him after he went to prison in a proceeding in which he had not pursued visitation rights with that child. He was released on probation in 1987, impregnated Dyan in 1988, began living with her a few months before Vicky was born in 1989 and was arrested and reincarcerated for new counts of burglary and larceny, as well as violation of probation, when Vicky was 15 months old, on 10/30/90. At the time of the filing of this petition, his estimated release date was October, 1998, with his earliest parole eligibility date being 2/28/96. His Corrections record also reveals multiple disciplinary infractions during the first two years of his current incarceration, the most recent being December of 1992. (State's Exh. I) At the time trial was concluded, Gary was classified as a #4 out of a range from 1 to 5 (1 being the most parole-eligible) based upon his 20-year history of criminal activity and the number of disciplinary problems in the first two years of his current incarceration. (Testimony of Dept. of Correction employee CT Page 6881-B Sparaco, 4/13/94.)
Six months after her husband's arrest in October of 1990, Dyan left Vicky with an unrelated man who, when she failed to return the next day, contacted her mother. The maternal grandmother, unable to keep Vicky or to contact her daughter, called DCF (then known as the Department of Children and Youth Services or DCYS) seeking foster placement for the child. When Dyan contacted DCYS she offered no plan for Vicky's care but refused to sign a voluntary permission to place the child. In order to place her in foster care, DCYS filed a petition alleging abandonment by the mother, and secured an Order of Temporary Custody.
When first placed in the W. foster home three months before her second birthday, Vicky did not talk, could not eat or sleep through the night, was afraid of "everything", and was masturbating excessively. (Testimony of foster mother, 5/6/94.) Her last contact with her mother was in October of 1991. She saw her father during court-ordered clinical evaluations in July of 1991 and again in February of 1992. Three visits with him in prison took place between April and July of 1992 when visitation was suspended by DCF after the recurrence of some of her negative behaviors which had abated after the first year in foster care (nightmares, exhibiting fearfulness, increase in sexualized activity).
Six months after being placed in foster care in April of 1991, Vicky was found to have been neglected by her mother and as uncared-for (homeless) as to her father, both parents entering pleas of nolo contendere. She was committed to DCYS pursuant to Sec. 46b-129 for an initial period of 18 months, extended after subsequent hearings to 12/24/94.
At the time of commitment on 10/24/91, expectations for eventual reunification with the mother were spelled out and signed by Dyan. (State's Exh. A.) This included maintaining contact with DCYS, weekly visitation and counselling. In the 16 months between the commitment date and the adjudicatory date for the instant petition (2/17/93, in the absence of any subsequently filed amendment to the pleadings, Practice Book Sec. 1042.1(4)) CT Page 6881-C Dyan fulfilled none of them:
1. Although agreeing to weekly visits in October of 1991, she never visited Vicky after that month, even during a period of time when she lived directly across the street from the foster home. She contacted the DCYS social worker a few times for visits but failed to appear when they were approved. She attended none of the Administrative Reviews of treatment plans prepared, as required by law, in December of 1991 (State's Exh. B), June of 1992 (State's Exh. C) or December of 1992 (part of court record). Following receipt of the latest treatment plan which, for the first time in the 19 months Vicky had then been in foster care, announced a plan ". . . to file Termination petitions", Dyan called the DCYS social worker, disclosed her marriage and birth of a new baby, and expressed her desire to have "no more contact" with the agency. (Testimony of social worker Miller-Schuyler, 4/13/94.
2. With the assistance of the social worker, an initial appointment to begin counselling had been made soon after commitment, but Dyan failed to return after an initial visit, even after personal contact had been made by an outreach worker from the counselling agency.
Gary, who had not sought visitation when originally divorced from Vicky's mother, did so in this forum soon after the neglect petition was filed. The decision on his motion to start visiting a 21-month old daughter whom he had then not seen in nine months was deferred pending the obtaining of a psychological evaluation. Vicky first saw her father in the course of that evaluation in July of 1991 and again in February of 1992. Although Dr. Mantell, the court-appointed clinical psychologist, found no immediate adverse response by the child to this renewal of contact with her father, he recommended against instituting regular prison visits based upon his estimate of the likely long-range planning that realistically could be made for her. Notwithstanding this recommendation, the court ordered the initiation of monthly prison visits commencing in April of 1992. After three visits, when Vicky displayed regressive behaviors, the court, following an evidentiary hearing on 11/5/92, suspended further visits pending yet another clinical evaluation by a different clinical psychologist. Two months after receiving Dr. Freedman's evaluation CT Page 6881-D (State's Exh. H), which made the same recommendation as had Dr. Mantell, DCF filed this instant petition to terminate Gary's parental rights.
During her foster placement, Vicky was twice evaluated by Dr. Parikh, a pediatrician specializing in child development assessments. In the spring of 1993 and again in early 1994, Vicky displayed lags in all areas (gross motor, fine motor, attention span, language). While Head Start had been recommended in 1993, by March of 1994 her needs were seen as exceeding the capacity of Head Start to meet, requiring special programming by the school system. (Testimony of Dr. Parikh, 4/13/94; State's Exh. F and G.) After nearly three years in an impermanent and inadequate foster home, Dr. Parikh found ". . . an urgent need to find a permanent placement where she can be exposed to a consistent and more stimulating and growth promoting environment to meet her special needs." (State's Exh. G, p. 5.) Dr. Parikh expressed "shock" that Vicky had made so little progress in the nine months between evaluations. (Testimony of 4/13/94.) Vicky actually displayed regression in her language skills in this interim and needed a caretaker with more specialized skills and a more positive view of her than was possessed by her foster family. At nearly five years of age, according to Dr. Parikh, Vicky needed a permanent caretaker capable of meeting her multiple special needs who would be more clearly invested in her than were either of her present foster parents.
Dr. Freedman, the most recent clinical evaluator, testified that the negative effects on Vicky of prison visits with her father were not ascribable to any inappropriate behavior on his part but, because these visits were stressful for the child, they exacerbated any tendency to regressive behaviors. Dr. Freedman saw no indication of any existing parent-child relationship either at the time of the evaluation or historically, Vicky demonstrating even more interest in the psychologist than in her father. (Testimony of 4/13/94; State's Exh. H, p. 5.) Because of this lack of existing bond between father and daughter and the remoteness of any plan for his being able to assume her care, Dr. Freedman saw no benefit that Vicky could derive from these prison visits. Like Dr. Parikh, Dr. Freedman found Vicky to be "clearly a CT Page 6881-E special needs child" who needed more than the usual degree of parenting to keep her on a normal developmental track. (Testimony of 4/13/94.) Prison visits were counterindicated since, as a "special needs child", she needed life to be made simpler, not more complex. Since he found neither a previously existing parent-child relationship nor any basis for predicting a time when the father would be capable of providing the necessary degree of special parenting that she required, future prison visits would only have a negative impact on her and could not, therefore, be recommended.
The only immediate plan offered by Gary was for Vicky to live with his parents until his release from prison. His parents were elderly, however, the paternal grandmother suffering from arthritis to the extent that she found it difficult to arise from a chair or walk stairs unaided, and they have never applied to be licensed by the state for this purpose. During his testimony on 5/6/94, Gary offered another interim plan for Vicky to be placed in the home of a girlfriend with three children, whom he had met just a month before offering this testimony. His third wife, whom he married while incarcerated in June of 1992, had already divorced him and he planned to make the new girlfriend wife #4 after his release from prison. He repeated in his testimony what he had previously told the social worker, that, regardless of the outcome of this case, he intended to appeal: "It will be a never ending battle . . . if I have to go through Federal court, I'll do it." (Testimony of 5/6/94.) Even if all doctors said it would be harmful for Vicky to visit him in prison, he would continue trying — via the legal process — to see her ". . . cause she's my daughter . . . unless she's going to commit suicide or something." (Testimony of 5/6/94.)
Adjudication — petition filed on facts as of 2/17/93, dateunamended
The petitioner has pleaded, as to the mother, all four of the nonconsensual grounds set forth in Sec. 17a-112
for terminating the rights of parents of children previously committed as neglected or uncared for, as was Vicky on 10/24/91. All of these grounds except abandonment have been pleaded as to the father.
One of these grounds must be dismissed as to both CT Page 6881-F parents at the outset: The denial of proper care and attention by reason of parental commission or omission. Since 4/26/91, the state of Connecticut was legally responsible for meeting all of Vicky's needs, first as temporary custodian and, after 10/24/91, as her legal guardian as well. The only evidence of failure to provide adequate care was testimony that this foster home did not appear adequate to meet the child's special developmental and emotional needs and as to the dilatory manner in which Dr. Parikh's recommendations of 1993 had been implemented by DCF. Neither of these failings can be ascribable to acts of parental omission or commission. Testimony of the foster mother as to Vicky's regressive behaviors following prison visits to the father do not provide proof by clear and convincing evidence that Gary's conduct toward his daughter either during her first 15 months, when they last lived together, or during these visits was inappropriate. The testimony rather supports the conclusion that prison visits to a father she had not seen for an extended period were stressful for her, and that stress of any kind could be expected to cause her behavior to regress. Her sexualized activities when first placed, which had abated but were exacerbated by the stress of the visits to her father, do not provide proof that his behavior toward her prior to October of 1990 had been sexually inappropriate. The fact that for the last six months before her placement in foster care she had lived with her mother in a number of different situations suggests that she might well have been exposed to inappropriate sexual activity during this period as much as in the period prior to her father's removal from the household. There was no direct evidence that the child had witnessed her father's violence directed toward the mother and certainly no clear and convincing proof that such violence, if it had occurred, resulted in damage to the child.
Consequently, this ground is dismissed with regard to both parents.
As to the mother: The petitioner has established clear and convincing proof to support the other three nonconsensual grounds alleged for terminating her parental rights.
(1) By not visiting, even once, in a period of 16 CT Page 6881-G months following commitment, the mother has abandoned Vicky not only in the statutory sense of failing to manifest a "reasonable degree of interest, concern or responsibility" but also in the common-law sense of a total and complete cessation of contact with the child.
(2) While she may have rehabilitated as far as her own life is concerned, this ground for terminating her parental rights relates to her capacity to provide primary caretaking for this particular child. At the time Vicky was initially placed in foster care, the occasion was her mother's failure to offer a plan for her placement OR to give voluntary consent for the state to place her in foster care. Dyan presented exactly the same posture on the adjudicatory date: She neither offered her own home to Vicky nor consented to Vicky's adoption but rather permitted the state to make a plan by default. This circumstance provides clear and convincing proof that Dyan has, vis-a-vis Vicky, ". . . failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [she] could assume a responsible position in the life of the child" within the meaning of subsection (b) of Sec. 17a-112 of the Conn. Gen. Stats. (Rev. 1993).
(3) Whatever relationship might exist between Dyan and Vicky, it could not, after a total absence from the child's life of 16 out of her then 45 months of life (as of the adjudicatory date) be regarded as a "relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." The absence of such relationship alone, of course, is not per se grounds to terminate parental rights. There must also be clear and convincing proof that ". . . to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." The proof of that in this case exceeds "clear and convincing": Dyan has not visited the child once since her commitment and has told DCF that she no longer wants to be contacted in regard to her. Clearly, to allow more than the 16 months that elapsed after commitment of this child in the vain hope of reestablishing a relationship with her mother would be highly detrimental to the best interest of this special needs child. CT Page 6881-H
As to the father: The petitioner has established clear and convincing proof of two nonconsensual grounds for terminating his parental rights: (1) At the time of Vicky's commitment to DCF, Gary had been incarcerated for a year with an estimated release date of October, 1998. Sixteen months later, he was in the identical situation, his rating for release-eligibility having been diminished by the many disciplinary offenses in his record. (State's Exh. I.) By the adjudicatory date of February of 1993, Gary had been divorced from Vicky's mother and had met, married and divorced a third wife during his incarceration. Nothing in his conduct during the current period of incarceration suggests that upon his release he will be changed in any significant way from the pattern of anti-social behavior that had been established for 20 years. If being free on parole, married to Dyan, working and living with his baby daughter had not provided him in 1990 with a sufficient incentive to change that pattern, it would be unreasonable to conclude that subsequently being rearrested, divorced, remarried and divorced again promised any greater motivation to change. The future may, indeed, hold something different for Gary than did his past, but there is nothing in the evidence to suggest that by 2/17/93 he had achieved ". . . such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child . . . [he] could assume a responsible position in the life of the child." Two expert witnesses testified that Vicky's developmental lags and emotional fragility made the early acquisition of a permanent home with more than ordinarily competent parents essential to maximize her potential. (2) Despite four visits with her father in the first half of 1992, Vicky continued to relate to him as she did with strangers. Indeed, Dr. Freedman noted in December of 1992 that she seemed more attached to him than to her father. This is not unusual considering the long separation initiated when he was rearrested in October of 1990 when Vicky was but 15 months old. Again, the absence of a parent-child relationship on the adjudicatory date does constitute, in itself, grounds to terminate a parent's rights. The court must also predict, on clear and convincing evidence as of that date, that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best CT Page 6881-I interest of the child." In early 1993, Vicky was evaluated to be a child with developmental lags in all areas and in need of a very high degree of sensitive and responsible permanent parenting. Nothing in Gary's circumstances on the adjudicatory date, considering his present sentence, his third marriage and divorce, the disciplinary problems during this period of incarceration and his plans for his release, provide any basis for the court to conclude that he could become such a caretaker within a period of time that this especially needy child could afford to wait beyond the nearly two years that she had already spent in impermanent foster placement. This consideration outweighs the fact that Vicky manifested no adverse reaction during the visits which did occur in 1992.
The petitioner has, therefore, established by clear and convincing evidence grounds to terminate the parental rights of both Gary D. and Dyan W.
Disposition on 5/6/94, final trial date
Before the court may consider terminating a parent's rights it is required to consider the seven factors set forth in subsection (d) of Sec. 17a-112 as amended by P.A. 93-193. In Re Barbara J., 215 Conn. 341, 47 (1990); In ReRomance M., 229 Conn. 345 (1994).
(1) DCF offered the mother weekly visitation at the time of commitment and made referral to appropriate counselling agencies. Dyan took advantage of neither of these opportunities to reunify with Vicky. After her marriage and birth of two younger children, she openly disavowed her interest in such reunification in speaking to DCF social workers and demonstrated this intention by failing to attend a single court hearing in connection with this petition. No services are possible to facilitate reunification of a committed child with an incarcerated father whose release date is years in the future. When he requested visits to be conducted in the prison, DCF reasonably sought a clinical evaluation before permitting initiation of such conduct. Two clinical evaluators recommended against such visitation, and there was credible evidence that Vicky's behavior regressed following the stress of those visits which did take place. CT Page 6881-J
(2) The efforts made by DCF to reunite this family were reasonable considering all operative circumstances.
(3) No court orders were entered into, except for the parents to attend clinical evaluations and court hearings. The father complied with the latter; the mother did not. While not orders, the court spelled out expectations at the time of commitment that were designed to facilitate reunification of mother and daughter. Dyan achieved none of these. No such expectations were spelled out for the father since his estimated earliest release date was then more than six years after Vicky's placement in foster care.
(4) The child has no feelings or emotional ties with either parent any more positive than she displays toward any friendly stranger. She appears bonded to foster parents who are not, however, deeply invested in her, do not see her in a positive light, and have no plan for keeping her custody indefinitely.
(5) At the time of disposition Vicky was nearly five years old. She had not lived with her father since she was 15 months old, or with her mother since she was less than two years old. Her special needs make it essential that she be given the stability of a permanent home with parents who are especially skilled in handling her multiple special needs. She cannot afford to wait for this any longer.
(6) Neither parent has made any visible effort to adjust their circumstances, conduct or conditions to make it in Vicky's best interest to return to their home in the foreseeable future. Dyan has cut the child altogether out of her new life with her third husband and the two younger children from that union. Gary articulates, from prison, his intent to assume Vicky's care as soon as he is paroled, but in the meantime appears content to have her either remain in a foster home which is clearly incapable of meeting her needs, or to be placed with his elderly parents although his mother is incapable of meeting her needs, or to be moved to the home of a girlfriend whom he met just a month before proposing her as a potential caretaker for Vicky. From the time she first came into state foster care, Gary did make efforts to resume contact with her, but the suspension of his visitation was dictated by the CT Page 6881-K child's needs as recommended by two independent clinical psychologists at evaluations conducted over a period of 17 months.
(7) Nothing prevented Dyan from maintaining a meaningful relationship with her daughter. The cessation of contact was her own decision made at the time of the original commitment in October of 1991. While visitation with the father was suspended by DCF after two clinical recommendations, such suspension was not unreasonable considering the child's multiple developmental lags and negative response to stress. Gary lost any meaningful relationship with Vicky when, in disregard of his responsibility for her upbringing, he continued his pattern of criminal activities which had begun in his youth and which did not abate with the birth of Vicky or his subsequent marriage to Vicky's mother. This activity, and his resultant return to prison when the child was 15 months old, for a term that is estimated to end when she is seven or eight years old, is what has "prevented [him] from maintaining a meaningful relationship with the child . . ."
Having considered the foregoing as well as the unrefuted testimony of Dr. Freedman and Dr. Parikh, it is found, by clear and convincing evidence, to be in the best interests of Vicky for her parents' rights to be terminated so that she may be placed in adoption with a family that will provide her with a permanent home and parents capable of meeting her many special needs.
It is, therefore, ORDERED, that the parental rights of Dyan W. and Gary D. in and to their daughter Victoria D. be, and hereby are, terminated. It is further ORDERED that the Commissioner of DCF be appointed statutory parent for the purpose of placing the child forthwith in adoption and, to secure this end, such Commissioner is ORDERED to submit to this court no later than 90 days after the date of this judgment a written report as to the progress toward adoption and thereafter to report in such form and at such intervals as this court shall from time to time require. If adoption is not finalized within one year from the date of this judgment, such Commissioner is further ORDERED to file with this court a Motion To Review Plan For Terminated Child at the end of one year from this date so that it may be reviewed in court no later than 15 months following the date of this judgment. CT Page 6881-L
Appeal
The right of either parent to appeal this judgment is governed by the rules set forth in the Practice Book Sec. 1059.1. Should an appeal be taken, during its pendency DCF will be under no obligation to make any further efforts to reunify this family, and the right of the parents to visit while not extinguished, shall be exercised only to the extent that such visitation is consistent with the best interest of the child.
Entered at Torrington this 7th day of July, 1994.
Frederica S. Brenneman, J.